*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 24-CF-0554

KENNETH M. DAVIS, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-CF3-005701)

(Rainey R. Brandt, *Judge*)

(Argued May 7, 2026                    Decided August 13, 2026)

*Matthew B. Kaplan* for appellant.

*Elizabeth Gabriel*, Assistant United States Attorney, with whom *Jeanine Ferris Pirro*, United States Attorney, and *Chrisellen R. Kolb* and *Gregory Evans*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: On a sunny afternoon in May 2021, Shadonna Nance was driving with her two children on Eastern Avenue in Northeast Washington, D.C. When attempting to merge into the right lane, she passed very close to the car next to her. Although the cars did not touch, the driver of the second

car got out of his car, approached Ms. Nance's car, and fired a gun at Ms. Nance's car; he then turned and fired more shots in the direction of the cars behind him. The driver then returned to his vehicle, made a U-turn, and drove off in the opposite direction.

Appellant Kenneth M. Davis was identified as the shooter and was subsequently charged with multiple crimes related to the incident. After a jury trial, Mr. Davis was found guilty on eight counts, including assaulting Ms. Nance with intent to kill while armed (AWIKWA) and three counts of assault with a dangerous weapon (ADW). The trial court sentenced him to a total term of 390 months (32.5 years) of imprisonment.

On appeal, Mr. Davis contends that the trial court made several evidentiary errors, that there was insufficient evidence to convict him of one of the ADW counts, and that the court erred when sentencing him. We are unpersuaded that the trial court's evidentiary decisions challenged by Mr. Davis constitute reversible error or that the evidence was insufficient to support the challenged ADW count. We agree with Mr. Davis, however, that the trial court erred in sentencing him. We therefore affirm his convictions but vacate his sentence and remand to the trial court for resentencing.

## I.  Background

## A.  The Shooting

Ms. Nance and her two children were driving on Eastern Avenue in Northeast D.C. on May 19, 2021. As she approached the intersection of Eastern and Kenilworth Avenues, Ms. Nance tried to merge into the right lane. She got very close to a car in the right lane, a gray Maserati, which she thought was letting her merge. Although the cars did not touch, the driver of the second vehicle exited his vehicle, walked toward Ms. Nance's car until he was adjacent to its rear driver's side door, and fired a gun at Ms. Nance's car. As Ms. Nance attempted to drive away, she hit another car and then crashed into a light pole. After firing around seven shots at Ms. Nance's car, the shooter turned and fired more shots in the direction of the cars behind him. He then got back in his car, made a U-turn, and left the scene. All of this was captured on a nearby surveillance camera.

One of the bullets fired by the shooter injured Ms. Nance's left arm, and she had bullet fragments removed from her body at the hospital. Her five-year old child, A.S., who was sitting in the back of her car, sustained injuries to his hand from broken glass. Ms. Nance's other child, P.N., was sitting in the front passenger seat and was not injured. When officers from the Metropolitan Police Department (MPD) arrived, Ms. Nance told them that the gunman was driving a gray two-door Maserati

and was an older Black male who was approximately six feet tall and weighed roughly 200 pounds, with a muscular build and a gray beard.

## B. The Investigation

The next day, as part of its initial investigation, MPD contacted a local Maserati dealership. A detective spoke on the phone and then met in person with Anthony Johnson, a service director at the dealership. Mr. Johnson testified that he knew Mr. Davis from various service appointments Mr. Davis had made for his Maserati GranTurismo. Starting around 2018, Mr. Davis dropped his Maserati off for service one to two times a year. Mr. Johnson identified records from the dealership that indicated that Mr. Davis's Maserati was serviced and was ready to be picked up on May 18, the day before the shooting. Although he could not confirm that Mr. Davis picked up his Maserati that day, Mr. Johnson testified that Mr. Davis usually picked up his own car and that the car was gone from the dealership on May 19, the day of the shooting.

After viewing a video of the shooting with the detective, Mr. Johnson identified the gunman's Maserati as belonging to Mr. Davis. He noted multiple features of the Maserati in the video, including wheel rims that were "color matched" with the body of the car and the customized fixture of the license plate on the front of the car by a "tow hook" on the passenger side, which enabled him to identify it as

Mr. Davis's car. Mr. Johnson did not identify Mr. Davis as the gunman in the video, but he did note that the shooter had the same physical build as Mr. Davis.

Although he did not tell the detective this, Mr. Johnson also testified that he had interacted with Mr. Davis earlier in the day following the shooting when Mr. Davis came to the Maserati dealership. Mr. Davis came alone, but not in his GranTurismo. Mr. Davis asked Mr. Johnson how quickly he could have the color of the wheels, or rims, on his GranTurismo changed. Although he did not specify a color, Mr. Davis was adamant that he needed the color of the wheels changed as quickly as possible. Mr. Johnson was unable to accommodate the request that day because it required making an appointment with a third-party vendor.

Eight days after the shooting, Ms. Nance selected Mr. Davis's picture from a police photo array and identified him as the gunman. After seeing Mr. Davis's photo, Ms. Nance noted that "it was him," that she was "positive," and that her "heart [was] pounding." Ms. Nance later confirmed that she got a "good look at the suspect's face" and that she remembered the gunman's nose and was "one hundred percent sure" Mr. Davis was the gunman.

In addition to this evidence, historical cell site location information (CSLI) indicated that Mr. Davis's cell phone connected with two cell towers near the crime scene around the time of the shooting.

The MPD issued a press release on June 2, 2021, identifying Mr. Davis as the suspected gunman. Officers began to search for Mr. Davis but, despite checking addresses associated with him and his family members, were unable to locate him. At the address of a woman who identified herself as Mr. Davis's mother, police found a Maserati in the garage covered with a tarp. Mr. Davis was eventually located in Costa Rica, and he returned to the United States on August 8, 2021.

### C.   The Verdict and Sentencing

At the conclusion of trial, the jury found Mr. Davis guilty of eight offenses: (1) AWIKWA with respect to Ms. Nance (D.C. Code §§ 22-401 & -4502), (2) two counts of ADW with respect to Ms. Nance's children, P.N. and A.S. (D.C. Code § 22-402), (3) one count of ADW against another victim who was located in one of the cars behind Mr. Davis's, and (4) four counts of possession of a firearm during a crime of violence (PFCOV) (D.C. Code § 22-4504(b)) in connection with the other four convictions.

The trial court sentenced Mr. Davis to 138 months for the AWIKWA conviction and 84 months for each ADW conviction, with all four convictions to run consecutively to each other, for a total term of imprisonment of 390 months. The court also merged Mr. Davis's four PFCOV convictions and sentenced him to an additional 84 months of imprisonment, to run concurrently with the other sentences.

This appeal followed.

## II. Analysis

Mr. Davis raises five issues on appeal. First, he argues that the trial court abused its discretion in admitting Mr. Johnson's testimony. Second, he contends that the court erred in admitting Ms. Nance's photo array identification. Third, he asserts that the court abused its discretion by admitting evidence of his flight. Fourth, he claims that there was insufficient evidence to convict him of ADW with respect to P.N. And fifth, Mr. Davis argues that the trial court erred when sentencing him. We discuss each claim seriatim.

### A. The Trial Court Did Not Abuse Its Discretion in Admitting Mr. Johnson's Testimony

Mr. Davis asserts that the trial court improperly admitted Mr. Johnson's testimony regarding Maserati vehicles because the testimony exceeded the bounds of lay opinion testimony sanctioned by Federal Rule of Evidence 701 and strayed into the realm of expert testimony. Mr. Davis's argument has no traction.

#### 1. Additional Background

Before trial, the government notified Mr. Davis that it intended to call Mr. Johnson as an expert witness "in the field of Maserati vehicles." Mr. Davis moved

to exclude Mr. Johnson as an expert. The trial court granted his motion after concluding that Mr. Johnson's experience did not rise to a sufficient level of expertise and that jurors would be able to understand his lay testimony without difficulty. The court added that, in providing his lay testimony, Mr. Johnson could testify only about his knowledge of Mr. Davis's car and similar matters rooted in his experience and could not stray "beyond the scope of his knowledge." The court specifically noted that Mr. Johnson could testify about why Mr. Davis's Maserati was unique compared to other cars Mr. Johnson had seen at the dealership but not compared to Maseratis generally.

At trial, Mr. Davis objected to aspects of Mr. Johnson's testimony that in his view violated the court's pretrial ruling. After a lengthy argument, the trial court sustained the objection and reiterated its pretrial ruling that Mr. Johnson could testify only about Maseratis that he had interacted with or had experience with. The court later sustained similar objections by Mr. Davis when the government asked Mr. Johnson to opine about Maseratis generally.

The court allowed Mr. Johnson to testify that he was familiar with Maserati GranTurismos—the model Mr. Davis owned—based on his time working at the dealership and his personal ownership of the same model. Mr. Johnson further testified, without objection, that Mr. Davis's GranTurismo had three exterior

features that helped him identify it: (1) wheel rims that were "color matched" with the body of the car; (2) red brake calipers; and (3) the fixture of the front license plate by a "tow hook" on the passenger side. From his review of the video of the shooting, Mr. Johnson asserted that he knew the car in the video was Mr. Davis's Maserati because he recognized the tow hook-mounted license plate and the color-matched wheels. Mr. Johnson also noted another "distinguishing characteristic" of Mr. Davis's car—the "Cuoio Sabbia" interior color. When asked if, out of the roughly 5,000 Maseratis he had come across, he had seen another with the combination of features installed on Mr. Davis's car, Mr. Johnson said no and that Mr. Davis's car was the only one with all of them.

## 2. *Standard of Review*

"Whether [lay] opinion [testimony] is helpful to the jury and hence admissible is a question entrusted to the sound discretion of the trial court, and its admission of such testimony will not be overturned unless it constitutes a clear abuse of discretion." *Gee v. United States*, 54 A.3d 1249, 1261 (D.C. 2012) (citation modified). In reviewing for abuse of discretion, we must determine "whether the decision maker failed to consider a relevant factor, whether [the decision maker] relied on an improper factor, and whether the reasons given reasonably support the conclusion." *Austin v. United States*, 343 A.3d 928, 941 (D.C. 2025) (citation

modified). "The trial court must make an informed choice drawn from a firm factual foundation." *Willis v. United States*, 353 A.3d 874, 882 (D.C. 2025) (citation modified). Our "role in reviewing the exercise of discretion is supervisory in nature and deferential in attitude." *In re Z.W.*, 214 A.3d 1023, 1037 (D.C. 2019) (quoting *In re D.B.*, 947 A.2d 443, 446 (D.C. 2008)). "We defer to trial courts' evidentiary rulings because we recognize that trial courts exercise on-the-spot judgment in the heat of trial, with access to information such as witness demeanor that escapes review on the cold appellate record." *Austin*, 343 A.3d at 941 (citation modified). Nevertheless, "because the exercise of [a court's] discretion must be founded upon correct legal principles, it is an abuse of discretion if the trial judge rests [their] conclusions on incorrect legal standards." *(Damion) Jones v. United States*, 17 A.3d 628, 631 (D.C. 2011) (citation modified).

### 3.    *Discussion*

We are satisfied that Mr. Johnson's testimony was consistent with the requirements of Federal Rule of Evidence 701.[1] "Opinion testimony by lay witnesses

---

[1] "Although the Federal Rules of Evidence are inapplicable in the D.C. Superior Court and the D.C. Court of Appeals, Federal Rule of Evidence 701, regarding opinion testimony by lay witnesses, states the law as it has developed in this jurisdiction." *King v. United States (King I)*, 74 A.3d 678, 681 n.12 (D.C. 2013) (citation modified); *see (Tyrell) Johnson v. United States*, 232 A.3d 156, 163 (D.C. 2020) (recognizing that we have adopted Rule 701 in this jurisdiction).

is admissible if it is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness['s] testimony or the determination of a fact in issue." *Gee*, 54 A.3d at 1261 (citation modified); *see* Fed. R. Evid. 701; *see also Bedney v. United States*, 684 A.2d 759, 767 (D.C. 1996) ("A non-expert witness may express opinions when testifying, so long as they are based on the witness'[s] personal observation of events and are helpful to the jury in fulfilling its role as fact-finder."). "Lay opinion testimony is particularly valuable where the lay witness[ ] [is] able to make the challenged identifications based on their familiarity with characteristics not immediately observable by the jury at trial." *Gee*, 54 A.3d at 1261 (citation modified). The testimony, however, must not be based on "scientific, technical, or other specialized knowledge." *Id.* (quoting Fed. R. Evid. 702); Fed. R. Evid. 701.

Mr. Davis's argument boils down to the contention that Mr. Johnson's testimony was based on "specialized knowledge" and constituted "prototypical expert testimony," and that the trial court therefore should not have admitted it given that the court had declined to qualify Mr. Johnson as an expert. The government argues that Mr. Johnson's testimony fits the definition of permissible lay opinion testimony because it was based on his own personal experiences with Mr. Davis's Maserati and thousands of others as part of his position as a service manager at the dealership. Although Mr. Johnson testified about customization options for

Maseratis, the government asserts that this was within the scope of his professional experience and does not reflect the "specialized knowledge" of an expert. The government also observes that the trial court properly enforced its pretrial order by sustaining Mr. Davis's objections when Mr. Johnson testified about Maseratis generally.

The government's arguments are more persuasive. Nothing in the record indicates that Mr. Johnson's testimony went beyond his "personal observations," *see Bedney*, 684 A.2d at 767, or was based on anything but his "perception" of events, *see Gee*, 54 A.3d at 1261; Fed. R. Evid. 701. It was established at trial that, starting in 2018, Mr. Johnson interacted with Mr. Davis once or twice a year when Mr. Davis brought his Maserati in for service. Mr. Johnson also was familiar with Mr. Davis's GranTurismo, including the features that made it recognizable to him. It was these features, in particular the unique combination of them compared to the thousands of other Maseratis that he had come across, that allowed Mr. Johnson to identify Mr. Davis's Maserati in the video of the shooting. In other words, Mr. Johnson's "opinion testimony [was] particularly valuable" because he was able to make a "challenged identification[ ] based on [his] familiarity with characteristics not immediately observable to the jury at trial." *Gee*, 54 A.3d at 1261 (citation modified).

Mr. Davis asserts that Mr. Johnson stated that the features of Mr. Davis's car were unique among *all* Maseratis. To the contrary, Mr. Johnson's testimony was based on Maseratis he had personally encountered. Thus, his opinion testimony complied with the trial court's pretrial order and was rooted in his own "personal observation[s] of events." *Bedney*, 684 A.2d at 767.

Mr. Davis's contention that Mr. Johnson's testimony was inadmissible because it was based on his "specialized knowledge" from Maserati training programs is unconvincing. Mr. Johnson worked at a Maserati dealership for four years as a service director, where he oversaw the maintenance shop and interacted with Maserati clients, including Mr. Davis, and their vehicles. He also owned the same model Maserati, albeit a newer version, as Mr. Davis. As we recently held, a lay witness is not precluded from "giving lay-opinion testimony that is based on their experience if it has also been a subject of their specialized training." *In re T.B.*, 331 A.3d 242, 256 (D.C. 2025). While Mr. Johnson did undergo certification training to learn about new Maserati models and repair procedures, his "perceptions" of the unique nature of Mr. Davis's Maserati were gained through "personal experiences" not necessarily tied to that training. *See id.* The "reasoning process" for his "proffered opinion" was his knowledge of Mr. Davis's vehicle compared with the thousands of other Maseratis he has encountered, including his own. *See id.* Such "personal observations" made "in his every day work" fit squarely within our

prescribed limits for permissible lay-opinion testimony. *Id.*; *see* Fed. R. Evid. 701; *see also (Tyrell) Johnson v. United States*, 232 A.3d 156, 163-64 (D.C. 2020) (concluding that a courtroom clerk's testimony about court procedures was admissible as lay opinion testimony because it was "premised on the clerk's own personal knowledge and experience"); *King v. United States (King I)*, 74 A.3d 678, 681 (D.C. 2013) (collecting cases and noting that this court has allowed police officers to offer lay testimony "about the event in question based on their observation of similar events during their professional experience").

Accordingly, because Mr. Johnson's testimony was rationally based on his perception and experience; helpful to the determination of a fact in issue; not based on scientific, technical, or other specialized knowledge; and within the scope of the trial court's pretrial ruling, the court acted within its discretion in admitting the testimony.

### B.    The Trial Court Did Not Err in Admitting Ms. Nance's Photo Array Identification of Mr. Davis

Mr. Davis contends that the trial court erred when it concluded that Ms. Nance's identification of him was reliable after the court determined that the photo array used for the identification was impermissibly suggestive. We conclude that the

trial court did not err in deeming Ms. Nance's identification reliable and in therefore admitting the evidence.

## 1. *Additional Background*

In a pretrial motion, Mr. Davis moved to exclude Ms. Nance's photo array identification of him on the ground that the procedure was impermissibly suggestive and the identification was unreliable. The trial court agreed with Mr. Davis that the photo array was impermissibly suggestive because the photo of Mr. Davis contained two unique characteristics compared to the other photos—gray hair and a lack of a mustache—causing Mr. Davis to "stick[ ] out like a sore thumb." The court nonetheless denied Mr. Davis's motion because it concluded, under the test set forth in *Neil v. Biggers*, 409 U.S. 188 (1972), that under the totality of the circumstances Ms. Nance's identification was reliable. These circumstances included the fact that, as an investigating police officer testified at the hearing on Mr. Davis's motion, Ms. Nance told him on the day of the shooting that she could see Mr. Davis's face "clearly" when she moved alongside and then past his car. In addition, Ms. Nance's photo array identification occurred only eight days after the shooting. The court also determined that Ms. Nance was paying attention during her interaction with Mr. Davis, as demonstrated by her accurate identification and certainty in identifying him.

Ms. Nance was reluctant to testify in court. To secure her appearance, the government obtained a material witness warrant, pursuant to which she was arrested. During her trial testimony, Ms. Nance conveyed that she did not want to be in court because she did not feel "comfortable" or safe and expressed anger at having spent three days in jail before testifying. The court described Ms. Nance as "uncooperative" and permitted the government to treat her as a hostile witness and to lead her.

Ms. Nance's discomfort and annoyance was reflected in her testimony, in which she expressed little confidence in the accuracy of her identification of Mr. Davis and claimed that her selection of him in the photo array was based more on the video of the shooting, which she had watched several times, than on what she saw on the day of the shooting. She also stated that her initial description to police of the shooter's appearance was based not on her own observations but on what other witnesses told her. Ms. Nance acknowledged, however, that she identified Mr. Davis as the gunman from the photo array and that she previously told the grand jury that her identification was accurate.

### 2. *Legal Framework and Standard of Review*

"Out-of-court identifications are addressed in a two-step inquiry: whether the identification procedure was so impermissibly suggestive as to give rise to a very

substantial likelihood of misidentification, and if so[,] whether the identification is nonetheless sufficiently reliable." *Walker v. United States*, 201 A.3d 586, 596 (D.C. 2019) (citation modified). As relevant here, if a defendant successfully establishes that identification procedures were impermissibly suggestive, "then the government may avoid suppression only by establishing that the identification was nonetheless reliable viewed in the totality of the circumstances." *(Floyd) Long v. United States*, 156 A.3d 698, 707 (D.C. 2017); *see Morales v. United States*, 248 A.3d 161, 176 (D.C. 2021) ("Reliability is the linchpin in determining the admissibility of identification testimony." (citation modified)). "This requires weighing the independent (and non-suggestive) basis for the identification against 'the corrupting effect of the suggestivity' itself." *Morales*, 248 A.3d at 176 (citation modified) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). In determining whether an identification was sufficiently reliable, courts consider the five factors outlined in *Biggers*: "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness'[s] degree of attention, (3) the accuracy of [their] prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." *Id.* (quoting *Biggers*, 409 U.S. at 199-200); *see also Caesar v. United States*, 357 A.3d 1146, 1158 (D.C. 2026) (noting that we have "previously adopted

the five-factor totality test set forth" in *Biggers* "to determine the reliability of an identification").

"Suggestivity and reliability are mixed questions of law and fact. We review mixed questions of law and fact under our usual deferential standard of review for factual findings and apply de novo review to the ultimate legal conclusions based on those facts." *Young v. United States*, 305 A.3d 402, 435 (D.C. 2023) (citation modified). With regard to the admissibility of pretrial identifications, "[t]his court is bound by the trial court's findings on suggestivity and reliability as long as they are supported by the evidence and are in accordance with the law." *Bolanos v. United States*, 938 A.2d 672, 685 (D.C. 2007).

### 3. *Discussion*

As neither party challenges the trial court's determination that the photo array used to identify Mr. Davis was impermissibly suggestive, we assume, without deciding, that it was, and we turn to reliability. *See Young*, 305 A.3d at 436 (assuming, without deciding, the pretrial identification was impermissibly suggestive before turning to reliability analysis); *see also Caesar*, 357 A.3d at 1159-60 (determining that when both parties agree that an out-of-court identification is "inherently suggestive," "the issue of suggestiveness is dispelled, and we need only consider whether the identification was reliable").

Mr. Davis argues that the court erred in its reliability finding because Ms. Nance's prior description of him "did not provide meaningful support for the accuracy" of the photo array and was, in the trial court's words, "bland." We disagree. Starting with the first *Biggers* factor, the evidence shows that Ms. Nance observed Mr. Davis in broad daylight moments before the shooting when their cars were parallel to each other at a traffic light. At the hearing on Mr. Davis's motion to exclude the identification, an investigating police officer testified that Ms. Nance told him on the day of the shooting that she could see Mr. Davis's face "clearly" during this interaction. While Ms. Nance's opportunity to view Mr. Davis was not as extensive as in some of our other cases, *see, e.g.*, *McCoy v. United States*, 781 A.2d 765, 770 (D.C. 2001) (noting the victim had a "good opportunity" to view the defendant during their three-to-five-minute struggle in a sunlit stairwell), the evidence supports the trial court's finding that "nothing obstruct[ed]" Ms. Nance's "ability to see the shooter's face," which bolsters the conclusion that her identification of Mr. Davis was reliable, *see Bolanos*, 938 A.2d at 685.

As the third *Biggers* factor generally reinforces the second because the accuracy of a witness's prior description of the defendant is indicative of the witness's attentiveness, we assess those factors together. *See (John) Jones v. United States*, 879 A.2d 970, 978 (D.C. 2005) (holding that a witness's accurate description on the day of the crime allows a trial court to conclude that their degree of attention

supports a reliability finding); *see also United States v. Rivera-Rivera*, 555 F.3d 277, 284 (1st Cir. 2009) (concluding that a witness's identification was reliable where, among other things, the witness's "recollection of detail reflect[ed] attentiveness to his surroundings"). Here, the record shows that Ms. Nance described the shooter to responding police officers as an older Black male who was approximately six feet tall, weighed roughly 200 pounds, and had a muscular build and a gray beard. Thus, she reported a "distinct" characteristic—Mr. Davis's gray beard, *cf. Patrick v. United States*, 343 A.3d 573, 588 (D.C. 2025) (concluding that witness's prior description did "not meaningfully contribute to a finding of reliability" when she "omitted" the most "distinctive characteristics" of the defendant, including his "full beard")—and provided detailed features that proved to be, as the trial court found, "pretty spot on" as to what Mr. Davis looks like. *Cf., e.g.*, *Young*, 305 A.3d at 437 (noting that a witness's accurate description of the defendant's build and height before the photo array identification contributed to a finding of reliability); *Cureton v. United States*, 386 A.2d 278, 285-86 (D.C. 1978) (noting that eyewitness's description revealed "close attention to detail" where it included assailants' "race, sex, age, height and weight" and described "hair style, facial hair, skin color, clothing, and the type of weapon employed by each").

Ms. Nance's description strongly suggests that she was paying attention when she observed Mr. Davis. There is no indication that, for example, she was under

duress or focused on the surrounding circumstances when she initially observed Mr. Davis. *Cf. Patrick*, 343 A.3d at 588 (noting that the witness had little opportunity to observe the defendant thoroughly because she was "under serious distress" with a gun pointed at her); *Morales*, 248 A.3d at 178 (concluding that a police officer's attention to a shooting suspect's identification was diminished by the officer's "principal aim" of safely apprehending the suspect who was fleeing and "fidgeting" with his waistline "as if to draw a weapon"). Even if Ms. Nance's description was, in the words of the trial court, "bland," its accuracy supports a determination that she was attentive because, as the court also found, it "matche[d]" Mr. Davis's appearance.

Accordingly, the record supports the trial court's finding that Ms. Nance's degree of attention was "pretty strong," which, combined with her prior accurate description before viewing the suggestive photo array, favors a finding of reliability. *See (John) Jones*, 879 A.2d at 978; *see also McCoy*, 781 A.2d at 770-71 (holding that a victim's "detailed and accurate description" of the defendant "prior to viewing the photo array" supported the conclusion that their identification was reliable); *(Damian) Long v. United States*, 687 A.2d 1331, 1338 (D.C. 1996) (reaching a similar conclusion).

Turning to the fourth *Biggers* factor, Ms. Nance was adamant upon viewing the photo array that Mr. Davis was the gunman. She told officers, after selecting Mr. Davis's photo from the array, that she "remember[ed] that nose" and was "one hundred percent sure that's him." She also noted that she was "positive" about her identification and that her "heart [was] pounding." Although Ms. Nance's confidence assuages any concern that her identification was completely off base, which is relevant in the totality of the circumstances, we decline to ascribe it affirmative weight in our analysis. *See United States v. Arthur*, 764 F.3d 92, 102 (1st Cir. 2014) ("A witness'[s] lack of confidence is certainly a reliable warning sign, while the presence of confidence is probably closer to a neutral factor." (citation modified)). Indeed, we have previously noted that this factor "is of minimal importance when the [witness's] certainty is expressed only after [a] suggestive identification procedure, and would thus seem to be a byproduct of that suggestivity." *Patrick*, 343 A.3d at 589 (citation modified); *see also (Christie Carolyn) Jones v. United States*, 262 A.3d 1114, 1125 (D.C. 2021) (noting the wide acceptance by courts "across the country" that there is a "weak correlation between confidence and" "the accuracy of [an] eyewitness identification"). While there is some evidence, like her focus on Mr. Davis's nose, that Ms. Nance's confidence in her identification was not necessarily a "byproduct" of the suggestive photo array, *see Patrick*, 343 A.3d at 589, it is undisputed that the photo array was impermissibly

suggestive. Consequently, this factor, even when considering Ms. Nance's certainty, is of "minimal importance" and carries no "weight in our reliability calculus." *See id.*; *Benn v. United States*, 978 A.2d 1257, 1268 & n.39 (D.C. 2009) (noting that "the correlation between a witness's expression of certainty in an identification and its accuracy is, at a minimum, greatly overstated, and perhaps unwarranted").

Lastly, only eight days passed between the shooting and Ms. Nance's identification of Mr. Davis from the photo array. This relatively short passage of time suggests, as the trial court noted, that Ms. Nance's identification was far from "stale," and supports a finding that her identification was reliable.[2] *See (John) Jones*, 879 A.2d at 978 (holding that a photo identification five days after the offense supported reliability); *McCoy*, 781 A.2d at 771 (concluding that a witness's identification six weeks after the offense was reliable); *see also Biggers*, 409 U.S. at 201 (determining that an identification seven months after the crime supported a finding of reliability, even though such a length of time is typically "a seriously

---

[2] We are unconvinced by Mr. Davis's assertion that our conclusion in *Patrick*—that a gap of three hours between "the crime and confrontation" undermines a witness's reliability—impacts our decision here because *Patrick* dealt with a show-up identification, which has far stricter standards for timing than a photo array, *see* 343 A.3d at 589, and is generally considered less "reliable," *id.* at 581, 585-86.

negative factor," where the witness "made no previous identification at any of the showups, lineups, or photographic showings").

In sum, the reliability of Ms. Nance's photo array identification of Mr. Davis has ample support in the record. And most of the *Biggers* reliability factors—including the first and fifth, which are of "great importance"—weigh in favor of its admission. *See Young*, 305 A.3d at 437 n.22.

"Separate" from the *Biggers* factors, Mr. Davis also argues that the government failed to establish the reliability of Ms. Nance's photo array identification because, in his characterization, Ms. Nance "herself testified that it was not accurate," and a "fundamentally flawed photo identification cannot be nevertheless deemed reliable when the person who made the identification says it was not reliable." We take issue with both Mr. Davis's premise and his conclusion.

The premise—that Ms. Nance stated that her identification was not accurate—is not supported by the record. Ms. Nance—who appeared pursuant to a material witness warrant, said she felt uncomfortable, and was described by the trial court as "uncooperative"—testified that she "didn't know" who the shooter was and that she did not see the shooter's face when he got out of the Maserati. But she did not disavow her photo-array identification of Mr. Davis or her statement that she saw him at the traffic light preceding the one where the shooting took place and did not

say that Mr. Davis was not the shooter. Moreover, she frequently expressed a lack of recollection about the shooting and its aftermath and sometimes deferred to her prior grand jury testimony when impeached by the government.

As for his conclusion—that Ms. Nance's trial testimony bore on the reliability of her pretrial identification—Mr. Davis provides no authority for it. *Biggers* sets forth the factors relevant to the reliability of an identification, and they all focus on the circumstances surrounding the identification itself. If the factors demonstrate reliability and the identification is admitted, it is subject to consideration by the jury. At that point, any inconsistencies, wavering, or recantation at trial "present questions of credibility, and issues of credibility are committed to the sole and sound discretion of the jury, as the determiners of fact." *Payne v. United States*, 516 A.2d 484, 493 (D.C. 1986) (per curiam); *accord (Christopher) Smith v. United States*, 809 A.2d 1216, 1225 (D.C. 2002) ("It was for the factfinder . . . to assess the witness'[s] credibility based upon his testimony at trial and any impeaching evidence."). Even if it was clear that Ms. Nance had recanted her previous testimony, it remains for "the trier of fact" to "decide whether to accept as true the witness's original testimony or revised testimony." *In re M.C.*, 8 A.3d 1215, 1227 (D.C. 2010) (quoting *Payne*, 516 A.2d at 493); *cf. Payne*, 516 A.2d at 493 ("Conflicts created by a

witness'[s] recantation, like other internal inconsistencies within a witness'[s] testimony, are factual questions for the jury to resolve." (citation modified)).[3]

### C. The Trial Court Was Within Its Discretion in Admitting the Flight Evidence

Mr. Davis next argues that the trial court erred in two ways when admitting evidence of his flight after the shooting. The court's first misstep, according to Mr. Davis, was admitting the evidence despite the government's failure to satisfy our strict criteria for the admission of flight evidence. The court's second blunder, in Mr. Davis's view, was its failure to recognize that part of the flight evidence was inadmissible hearsay. His contentions are not compelling.

---

[3] Another procedural wrinkle in Mr. Davis's argument vis-à-vis Ms. Nance's testimony is his failure to renew his motion to exclude her identification of him at trial. We have previously noted that one court has "held that a defendant's failure to renew a pretrial motion to suppress based on evidence presented during trial precludes the defendant's reliance on the new evidence on appeal." *(Floyd) Long*, 156 A.3d at 706 n.1 (citing *United States v. Hicks*, 978 F.2d 722, 724 (D.C. Cir. 1993)). And we have adopted a similar position. *See Hampleton v. United States*, 10 A.3d 137, 139 n.4 (D.C. 2010) ("Because Mr. Hampleton did not move for reconsideration of the suppression motion at trial, he may not rely on later trial testimony to challenge the trial court's ruling."); *see also Otts v. United States*, 952 A.2d 156, 167 (D.C. 2008) (concluding that a failure to "revisit" a motion decided before trial when "new grounds" "surface at trial" "may preclude appellate relief, even if [the] claim[ ] ha[s] merit"). We need not decide, however, whether Mr. Davis can rely on Ms. Nance's trial testimony on appeal because consideration of her testimony, particularly her uncooperative demeanor, does not alter our conclusion that her pretrial identification was reliable. *See (Floyd) Long*, 156 A.3d at 706 n.1; *Wade v. United States*, 173 A.3d 87, 92 (D.C. 2017).

### 1. Additional Background

Before trial, the government filed a motion in limine providing notice of its intention to introduce evidence of consciousness of guilt based on Mr. Davis's flight after the shooting. It based its motion on Mr. Davis's departure for Costa Rica "within days" of the shooting; his hiding of his Maserati in the garage of a relative's house when he left; his inquiry about how quickly the color of the wheels on his Maserati could be changed; his deportation from Costa Rica after overstaying his visa; and his expressed belief that he could not be extradited to the United States from Costa Rica. In opposition, Mr. Davis asserted that his trip to Costa Rica was not flight because it was planned before the shooting and consistent with his history of business travel. He also argued that there was no evidence that he knew the police were looking for him and that it was not unusual to leave a car, especially a luxury vehicle like a Maserati, in a garage while traveling. In addition, Mr. Davis argued that the probative value of the evidence, when considered in light of his alternative explanation, was substantially outweighed by its prejudicial impact.

After hearing evidence and arguments on the motion, the trial court found that the evidence met the test for admissibility. The court also allowed Mr. Davis to introduce airline and bank records from January through August 2021 to counter the government's flight argument.

At trial, Mr. Davis objected on hearsay grounds to the introduction of evidence recounting the investigation into his whereabouts in the weeks after the shooting, arguing that the testifying officer, MPD Detective Matthew Dailey, learned about the addresses allegedly associated with him from an outside source. The court overruled the objection, concluding that the information was not being offered for the truth of the matter asserted. Mr. Davis also objected on hearsay grounds to Detective Dailey testifying that Mr. Davis was located in Costa Rica because the detective was not present when he was arrested and therefore lacked personal knowledge of the matter. The court overruled the objection, ruling that the officer was recounting the steps of the investigation, which was not hearsay.

### 2. Admission of the Flight Evidence Generally

We review the admission of evidence of flight for "an abuse of discretion and *Kotteakos* harmless error." *King v. United States (King II)*, 75 A.3d 113, 118 (D.C. 2013); *see Kotteakos v. United States*, 328 U.S. 750, 765 (1946) (holding that, for nonconstitutional error, affirmance is appropriate if the court "can[ ] say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error"); *Chandler v. United States*, 349 A.3d 1210, 1224-25 (D.C. 2026) (same).

"It is well settled in this jurisdiction that evidence of flight or disappearance can be admitted at trial as evidence of consciousness of guilt." *(Curtis) Smith v. United States*, 777 A.2d 801, 807 (D.C. 2001). "[B]efore evidence of flight may be admitted, the government must establish the following: (1) that the defendant's behavior was flight, (2) that the flight demonstrated consciousness of guilt, (3) that the consciousness of guilt was consciousness of guilt of the crime charged[,] and (4) that consciousness of guilt of the crime charged demonstrates actual guilt." *King II*, 75 A.3d at 118-19. Because of the potentially "strong impact" flight evidence might have on a jury, "once the trial court is satisfied these factors are met, [it] must, as in every decision to admit evidence, weigh its probative value against the potential for undue prejudice." *Id.* (citation omitted).

We "have acknowledged that the existence of alternative explanations for a defendant's flight—other than consciousness of guilt of the charged crime—will not necessarily preclude the presentation of flight evidence to a jury." *Id.* at 119 n.9 (citing *(Curtis) Smith,* 777 A.2d at 808). This court has, however, "never substituted the jury's evaluation of the defendant's competing explanation for the trial court's obligation to determine in the first instance whether the circumstances *reasonably support an inference* that the defendant fled because of consciousness of guilt of the charges relating to the charged crime." *Id.* (citation modified). "[W]hen giving a flight instruction, the trial court must fully apprise the jury that flight may be

prompted by a variety of motives and thus of the caution which a jury should use before making the inference of guilt from the fact of flight." *Headspeth v. United States*, 86 A.3d 559, 564 (D.C. 2014) (citation modified).

Mr. Davis claims that, because he provided an alternative explanation for his presence outside of the United States, the probative value of the flight evidence was in "substantial doubt." But that is not the standard for admitting flight evidence. *See King II*, 75 A.3d at 118-19. Merely offering an alternative explanation "does not render the flight evidence inadmissible," *(Curtis) Smith*, 777 A.2d at 808, because the trial court may still find that "the circumstances *reasonably support an inference* that [the defendant] fled because of consciousness of guilt of the charges relating to [the charged crime]," *King II*, 75 A.3d at 119 n.9 (alterations in original). As long as the trial court considers the alternative reason proffered by the defendant for avoiding the police, it may still admit the flight evidence if it determines that it is relevant to consciousness of guilt of the charged crime. *See id.* at 119. Here, the trial court found that such a reasonable inference existed, and Mr. Davis does not explain why that determination was error.

Mr. Davis also makes a cursory argument that the court erred because the prejudicial impact of the evidence outweighed its probative value. Even putting aside the perfunctory nature of his assertion, *see Comford v. United States*, 947 A.2d 1181,

1188 (D.C. 2008) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (citation modified)), it falls short because the record shows that the trial court carefully weighed "whether the probative value of such testimony is outweighed by the potential for prejudicial impact[,]" *King II*, 75 A.3d at 118 (citation modified). The court repeatedly expressed concern that the government's position about Mr. Davis's travel to Costa Rica was not strong enough and repeatedly delayed ruling on the government's motion. The court was wary of any attempt by the government to "bootstrap" consciousness of guilt evidence "into an argument that supports indicia of flight." It also made clear that it would not allow "speculation" about Mr. Davis's travel "before a jury, because that's damning." This apprehension led to the conditional granting of the government's motion so long as the parties agreed to let Mr. Davis introduce evidence of his alternate travel explanation.

As the trial court recognized the "strong impact" flight evidence might have on a jury and weighed that evidence's "probative value against the potential for undue prejudice," *id.* at 118-19 (citation modified), the court did not abuse its discretion in admitting it.

### 3. *Mr. Davis's Hearsay Arguments*

Mr. Davis's hearsay arguments are similarly unpersuasive. "Hearsay evidence, the in-court testimony of an out-of-court statement offered to prove the truth of the matter asserted, is generally not admissible at trial." *Laumer v. United States*, 409 A.2d 190, 194 (D.C. 1979) (en banc). An out-of-court statement "is not admissible unless it is not offered at trial to prove the truth of the matter asserted and therefore not hearsay, or it falls under another exception to the rule against hearsay." *Ashby v. United States*, 199 A.3d 634, 653 (D.C. 2019) (citation modified). "We review the admissibility of evidence for abuse of discretion, but the underlying question of whether or not a particular hearsay exception applies to certain statements is a question of law which we review *de novo*." *(Charles) Johnson v. United States*, 341 A.3d 1082, 1090 (D.C. 2025) (citation modified).

On appeal, Mr. Davis reiterates the arguments he made at trial about Detective Dailey's testimony, including that the detective lacked personal knowledge with respect to testimony that two addresses were associated with Mr. Davis and that the government eventually located Mr. Davis in Costa Rica. The government contends that the trial court was correct in ruling that Detective Dailey's testimony about the addresses was not offered for the truth of the matter asserted and, therefore, not hearsay. The government does not argue that the court correctly admitted Detective

Dailey's testimony about locating Mr. Davis in Costa Rica; instead, it asserts that, even assuming the testimony was hearsay, any error was harmless because unchallenged evidence also established that Mr. Davis was found in Costa Rica in August 2021.

Starting with the addresses, the government has the stronger argument. Detective Dailey testified that he visited two Maryland residences, one listed as Mr. Davis's home and the other belonging to Mr. Davis's mother. The trial court overruled Mr. Davis's hearsay objection for two reasons: first, Detective Dailey was "merely explaining what investigative tactics he took to locate the person wanted in this case; nothing more, nothing less," which was not hearsay; and second, his testimony was not being offered for the truth of the matter asserted (i.e., that Mr. Davis lived there). The court's decision is squarely supported by our case law; accordingly, we see no error.

Out-of-court statements introduced at trial are not hearsay if they are not offered to prove the truth of the matter asserted. *Ashby*, 199 A.3d at 653. Relatedly, "[e]vidence outlining the background of an investigation is admissible as non-hearsay." *Perritt v. United States*, 640 A.2d 702, 705 (D.C. 1994); *see Gamble v. United States*, 901 A.2d 159, 170 (D.C. 2006).

In *Perritt*, we held that testimony related to the investigatory process was offered not for the truth but to show that the investigation resulted in the identification of the defendant by two witnesses. 640 A.2d at 704-05. As a result, we concluded that "the trial court did not err in determining that the detective's testimony concerning the investigation of the shooting was admissible for the nonhearsay purpose for which it was offered." *Id.* at 705. Similarly, the investigatory process Detective Dailey testified about culminated in the discovery of important evidence: Mr. Davis's Maserati locked up in a relative's garage. In other words, the government offered his testimony to show that the investigation he undertook into Mr. Davis led to the finding of inculpatory evidence, not for the truth of the matter asserted—that Mr. Davis was affiliated with the addresses. Consequently, Detective Dailey's testimony about the addresses was not hearsay. *See id.*; *accord United States v. Duran*, 941 F.3d 435, 447 (10th Cir. 2019); *United States v. Meserve*, 271 F.3d 314, 319 (1st Cir. 2001).

Turning to Detective Dailey's testimony that the government located Mr. Davis in Costa Rica, Mr. Davis claims that the trial court erred in admitting the testimony and that the error was not harmless because the government relied on Mr. Davis's presence in Costa Rica in its closing argument to contend that he fled the country after the shooting. The government asserts that any error was harmless. We agree with the government.

Assuming without deciding that the trial court erred in admitting Detective Dailey's testimony on this point, we "ask whether the government has carried its burden of demonstrating with fair assurance that the judgment was not substantially swayed by the error." *Grimes v. United States*, 252 A.3d 901, 919 (D.C. 2021) (citation modified). Based on the record, we are confident that the government has met its burden. In addition to Detective Dailey's testimony, the government also introduced a certified Customs and Border Protection (CBP) record showing that Mr. Davis returned to the United States from Costa Rica in August 2021.[4] That document alone provided the government with a basis to assert in its closing argument that Mr. Davis was located "in Costa Rica, of all places." The government may have used Detective Dailey's testimony to bolster this fact, but that testimony ultimately was cumulative of other evidence documenting Mr. Davis's travel. Thus, the admission of the testimony was harmless.[5] *See id.* at 920 (concluding that when

---

[4] Although Mr. Davis's objected to the admission of the CBP document (but not its certification) at trial, he does not challenge its admission on appeal. Accordingly, Mr. Davis abandoned any challenge to the CBP document on appeal, and it can be considered as evidence showing his travel to Costa Rica.

[5] Reinforcing our conclusion are our previous decisions holding that the opportunity to counter flight evidence with defense evidence may contribute to a determination that error in admitting flight evidence was harmless. *See Gaines v. United States*, 994 A.2d 391, 402 (D.C. 2010) (concluding that the defendant's "forceful[ ]" presentation of "his theory of innocent flight" contributed to a determination of harmlessness); *(Curtis) Smith*, 777 A.2d at 809 n.13 (deciding that any error related to the introduction of flight evidence was harmless, in part, because

"inadmissible hearsay was largely cumulative of other evidence," its admission was harmless); *In re T.B.*, 331 A.3d at 255 (holding that the admission of hearsay evidence was harmless when the officer's testimony "added little or nothing" to another officer's similar opinion); *Doe v. Medlantic Health Care Grp., Inc.*, 814 A.2d 939, 950 (D.C. 2003) ("[T]he admission of Goldring's out-of-court statement through Fuell's testimony was cumulative of other evidence to the same effect, and, therefore, harmless."); *Settles v. United States*, 615 A.2d 1105, 1109 (D.C. 1992) ("Relevant to a determination of whether error (assumed or actual) in admitting

---

"[d]efense counsel was given full opportunity to explain any arguments on this issue to the jury"); *see also Williams v. United States*, 52 A.3d 25, 41-42 (D.C. 2012) (holding that the admission of evidence showing that the appellant did not attend the funeral of the decedent, his estranged wife, was harmless because appellant mitigated the evidence through cross-examination at trial). In this case, the court admitted Mr. Davis's airline and bank records and testimony about his job in the music industry. As Mr. Davis relied on this evidence during his closing argument to explain why he traveled to Costa Rica and how the trip fit into his normal business practice and to insinuate that the trip was planned before the shooting, we are further convinced that any error related to this portion of Detective Dailey's testimony was harmless.

We may also consider a jury instruction on flight in our harmlessness analysis. *See Pelzer v. United States*, 166 A.3d 956, 966 (D.C. 2017); *accord (Curtis) Smith*, 777 A.2d at 808-09 & n.13 (concluding that a jury instruction on flight evidence may undermine the harmful effect of improperly admitted flight evidence). Here the court "directed the jury not to impute any consciousness of guilt to [Mr. Davis] from his flight unless it . . . first concluded that the evidence showed that [Mr. Davis] had in fact fled," *Pelzer*, 166 A.3d at 966 (citing Criminal Jury Instructions for the District of Columbia, No. 2.301 (5th ed. 2015)), and that, if he did flee, to consider that his flight could have been motivated by innocent reasons, *see (Curtis) Smith*, 777 A.2d at 809 n.13.

certain evidence is harmless is the degree to which the evidence is cumulative of other, properly admitted evidence.").

### D.     The Evidence Was Sufficient to Convict Mr. Davis of ADW with Respect to P.N.

Mr. Davis argues that the evidence was insufficient to convict him of ADW with respect to P.N. We disagree.

### 1.     *Legal Framework and Standard of Review*

We review a challenge to the sufficiency of the evidence de novo. *Bailey v. United States*, 257 A.3d 486, 492 (D.C. 2021). "The evidence is sufficient if any rational fact-finder could have found the elements of the crime beyond a reasonable doubt." *Sanders v. United States*, 330 A.3d 1013, 1032 (D.C. 2025) (quoting *White v. United States*, 207 A.3d 580, 587 (D.C. 2019)). In addressing a sufficiency challenge, we view the evidence in the light most favorable to the verdict, giving "full play" to jury determinations about credibility, the weight of the evidence, and which reasonable inferences to draw from the facts presented. *Id.* (quoting *White*, 207 A.3d at 587). "[N]o distinction is made between direct and circumstantial evidence" when reviewing a sufficiency claim. *Mitchell v. United States*, 64 A.3d 154, 157 (D.C. 2013). "Although the government bears the burden of presenting sufficient evidence, the government is not required to negate every possible

inference of innocence." *Cherry v. District of Columbia*, 164 A.3d 922, 929 (D.C. 2017) (citation modified). Even so, we "must consider all of the evidence including that favorable to the defendant." *Schools v. United States*, 84 A.3d 503, 508 (D.C. 2013) (citation modified).

To establish that Mr. Davis committed ADW with regard to P.N., the government had to prove beyond a reasonable doubt "each of the elements of assault in addition to proving that the assault was committed with a dangerous weapon." *Mobley v. United* States, 101 A.3d 406, 419 n.10 (D.C. 2014) (quoting *Ruffin v. United States*, 642 A.2d 1288, 1295 (D.C. 1994)). "The three elements of assault are: (1) an act on the part of the accused (which need not result in injury); (2) the apparent present ability to injure the victim at the time the act is committed; and (3) the intent to perform the act which constitutes the assault at the time the act is committed." *Perez Hernandez v. United States*, 286 A.3d 990, 997 (D.C. 2022) (en banc) (quoting *Mobley*, 101 A.3d at 419 n.10).

### 2. *Discussion*

Mr. Davis argues there was insufficient evidence to convict him of ADW with respect to P.N. for two reasons: (1) P.N. was not injured in the shooting and (2) the government did not prove that he had the necessary intent because there is no evidence showing that he knew P.N. was in the car when he fired the shots.

Mr. Davis's first argument, which he does not elaborate on or provide any legal support for, is unavailing because it is well settled in this jurisdiction that "an assault conviction will be upheld . . . even though it causes or threatens no physical harm to the victim." *Dunn v. United States*, 976 A.2d 217, 220 (D.C. 2009) (quoting *Ray v. United States*, 575 A.2d 1196, 1199 (D.C. 1990)); *accord Perez Hernandez*, 286 A.3d at 997-98 (concluding that "no physical injury need have resulted" to constitute an assault).

Mr. Davis's second argument appears at first blush to be more compelling. He intertwines his supposed lack of intent with a claim that the trial court erroneously instructed the jury on the "transferred intent" doctrine. Ultimately, however, when the rubber meets the road, Mr. Davis's argument fails. For starters, the trial court instructed the jury on the theory of *concurrent* intent—not transferred intent—which permits a jury to reasonably infer that, "where the means employed to commit the crime against a primary victim . . . create[d] a zone of harm around that victim," "the defendant intended that harm to all who are in the anticipated zone." *Ruffin*, 642 A.2d at 1298 (citation modified); *see Gordon v. United States*, 285 A.3d 199, 212 n.10 (D.C. 2022) ("This jurisdiction has adopted the theory of concurrent intent . . . ."). More importantly, ADW is an extension of simple assault, *see Spencer v. United States*, 991 A.2d 1185, 1192 (D.C. 2010), which, in the case of an "attempted-battery assault" like the one at issue here, requires the government to

show only that the defendant had "the intent to perform the act which constitutes the assault at the time the act is committed." *Perez Hernandez* 286 A.3d at 997-98 (citation modified); *see id.* at 1000 (noting that "[t]here need not be a 'specific intent' to cause injury" for "an attempted battery (or completed battery)" (citation modified)).

Considering the evidence through this lens, we hold that a rational jury could have found beyond a reasonable doubt that Mr. Davis committed the elements of ADW with respect to P.N. *See Sanders*, 330 A.3d at 1032. The evidence at trial established that Ms. Nance's car was parallel to and to the left of Mr. Davis's vehicle while stopped at the traffic light preceding the one where the shooting occurred. This placed P.N., who was seated in the front passenger seat, on the side of Ms. Nance's car closest to Mr. Davis. Although the front passenger window may have had a slight tint, the tint was not dark enough to prevent people outside from seeing into the car. The evidence showed that before Mr. Davis exited his car his driver's side window was down and he was sticking his head out of it, seemingly looking at Ms. Nance's vehicle. As Mr. Davis exited his car, he was again staring at Ms. Nance's car from an angle that suggests that he was able to see into the front passenger seat. He then moved from the rear passenger side to the driver's side and got within "inches" of Ms. Nance's car, to the point that he was able to tap on it. At that point Mr. Davis was standing next to the rear driver-side door, the window of which was tinted more

than the front windows but not enough to prevent him from seeing inside from such a close distance. Ms. Nance's driver's window was also partially down. Mr. Davis then fired around seven shots into both windows on the driver's side of Ms. Nance's car.

Taking this evidence together, we hold that it was sufficient for the jury to reasonably infer that Mr. Davis was cognizant that P.N. was in Ms. Nance's car or, at the very least, that she "was not alone." *Mobley*, 101 A.3d at 420. We also conclude that the evidence was sufficient for a rational factfinder to find that Mr. Davis—when firing seven bullets at Ms. Nance's car—had the requisite intent to be convicted for ADW with respect to P.N. *See id.* (upholding ADW convictions because it was reasonable for a jury to infer that appellants "had reason to believe" that the target of their bullets "was not alone and that gunshots would endanger" the other victims "whose cars were in the line of fire"); *Ruffin*, 642 A.2d at 1296 (sustaining conviction for ADW with respect to a vehicle's passengers when the appellant knew the driver of the car, at which he unleashed "a hail of gunfire," was not alone). "This is so even if [Mr. Davis] did not specifically aim at [P.N.] or intentionally seek to harm [her]." *Ruffin*, 642 A.2d at 1296; *see id.* ("[T]he intentional firing of multiple shots into the confined space of a small *passenger* vehicle could sustain an assault charge on each occupant of the car, even if the assailant did not have actual knowledge that such passengers were present.").

### E.     Mr. Davis Must Be Resentenced

Mr. Davis argues that the trial court erred when sentencing him because it incorrectly thought it was bound to follow the District of Columbia's Voluntary Sentencing Guidelines. We agree that the trial court erred and we therefore vacate Mr. Davis's sentences and remand to the Superior Court for resentencing before a different judge.

### 1.     *Additional Background*

After the guilty verdict, the government filed a sentencing memorandum seeking a total sentence of 360 months. At an initial hearing, Mr. Davis moved to continue the sentencing because of errors in his Presentence Investigation Report (PSR). The trial court granted his request but told the parties that the minimum sentence it could impose was thirty-two and a half years and that, while the parties "are going to argue for whatever [they're] going to argue," the "number may go up, but it most certainly cannot go down." Then, before ultimately granting the continuance, it added, "So in the face of all that, I . . . wonder why you want to put [sentencing] off."

At the next sentencing hearing, Mr. Davis repeatedly asked the trial court to depart from the guidelines on the ground that the recommended sentence was too

severe in light of several mitigating factors. He specifically argued that the guidelines recommendation that he receive consecutive instead of concurrent sentences was "excessive" and that a sentence of eleven and half years was "just and appropriate." The trial court disagreed, noting that Mr. Davis's criminal history score was "driving [the sentencing] train." This placed him "in the absolute last column" of the guidelines, "where all those high numbers are." The court acknowledged Mr. Davis's request for a departure but stated that, even if it "were willing to depart," it "can't up and depart without a legal basis." Any departure, in the court's view, would "have to [be] base[d] . . . on mitigation factors that our sentencing Commission has devised."

The court then turned "quickly" to the guideline's mitigating factors and found that none "appl[ied] in this case." It noted that Mr. Davis's request for a departure was based on the ninth mitigating factor in the guidelines, which allows for a departure from consecutive sentences if consecutive sentences would be "excessive" and "result in manifest injustice," D.C. Voluntary Sentencing Guidelines Manual § 5.2.3(9) (D.C. Sentencing Commission 2023), but it declined to depart on this ground because Mr. Davis "could have easily" killed four victims and, "equally as important," Mr. Davis's criminal history was extensive.

Having determined that none of the mitigating factors applied, the court described Mr. Davis's sentence as a "math problem" that was "dictate[d]" by the guidelines, and said that both parties had gotten the math wrong. The court then "illuminat[ed]" the parties on the correct solution to the math problem. First, for Mr. Davis's conviction for AWIKWA, the court noted that a mandatory minimum sentence of ten years applied because this was not Mr. Davis's first offense. Next, the court found that the mandatory minimum for each PFCOV conviction was five years, but the "bottom guideline number" was seven years because of Mr. Davis's criminal history. The court then determined that the lowest guideline number for Mr. Davis's three ADW convictions was three and a half years, but it found that, to be a "guideline compliant sentence," the ADW sentences needed to "be at least equal to the PFCOV" sentences of seven years.

After completing this breakdown, the court told the parties that "[t]he guidelines require this court to run the [AWIKWA] and the ADW [sentences] consecutive to each other." The court then revealed that it had called the Sentencing Commission to "walk [it] through these numbers," and it had determined, based on this phone call, that there was "no legal possibility that the [c]ourt can go under" the thirty-two and a half years that it had identified as Mr. Davis's minimum sentence at the previous hearing.

The court then sentenced Mr. Davis to 138 months for his AWIKWA conviction, 84 months for each ADW conviction—to run consecutively to each other and the AWIKWA conviction—and concurrent sentences of 84 months for each PFCOV conviction, for a total of 642 months or fifty-three and half years, thirty-two and a half years of which Mr. Davis would have to serve consecutively. Mr. Davis did not object after the sentence was imposed. He now argues on appeal that the court's comments at the sentencing hearings "make it clear that [the court] believed it was obligated to impose a within-guidelines sentence."

## 2. *Standard of Review*

The parties disagree on the applicable standard of review. Mr. Davis contends that, because he repeatedly asked the court to depart from the guidelines, he preserved his claim and we should review for an abuse of discretion. The government argues that we should review only for plain error because Mr. Davis did not object to his sentence after it was imposed.

Mr. Davis's argument is more persuasive. "[A] party preserves an issue for appeal so long as the trial court, at the time it rules and on a realistic assessment of the record, is fairly apprised of their position." *Evans v. United States*, 304 A.3d 211, 222 (D.C. 2023). Although the government is correct that Mr. Davis did not object after the trial court imposed the sentence, the record establishes that he "fairly

apprised" the court of his position that the guidelines were not mandatory and that the court should grant a departure. *See id.* Mr. Davis specifically argued that the guidelines recommendation that he receive consecutive instead of concurrent sentences was "excessive" and that a sentence of eleven and half years was "just and appropriate." *Cf. Briscoe v. United States*, 181 A.3d 651, 657 (D.C. 2018) (applying plain-error standard when defense counsel "never argued" that the court had discretion not to impose a mandatory-minimum sentence). As noted above, the trial court disagreed and found that "the guidelines require this court to run the [AWIKWA] and the ADW [sentences] consecutive to each other." As this apparent misunderstanding about the binding nature of the guidelines is the crux of Mr. Davis's argument on appeal, we conclude that the issue was adequately preserved. *See id.*

Consequently, we review the court's alleged error for an abuse of discretion. *See (Vincent) Johnson v. United States*, 628 A.2d 1009, 1015 (D.C. 1993) (noting that "the sentencing process is subject to appellate scrutiny for abuse"). "We have long recognized that the trial court has broad discretion in matters of sentencing." *Rider v. United States*, 687 A.2d 1348, 1353 n.10 (D.C. 1996). But a "[f]ailure to exercise choice in a situation calling for choice is an abuse of discretion whether the cause is ignorance of the right to exercise choice or mere intransigence because it assumes the existence of a rule that admits of but one answer to the question

presented." *(James) Johnson v. United States*, 398 A.2d 354, 363 (D.C. 1979); *see also Speaks v. United States*, 959 A.2d 712, 719 (D.C. 2008) (acknowledging that a court may err if it fails or declines to exercise its discretion during sentencing); *Matter of L.J.*, 546 A.2d 429, 435 (D.C. 1988) ("The Supreme Court has . . . made plain that we are authorized to reexamine the sentencing process where it is alleged that the judge totally failed to exercise his discretion in imposing sentence." (citation modified)).

### 3. *Discussion*

Section 3-101 of the D.C. Code establishes the District of Columbia Sentencing Commission as an independent agency within the District's government. The statute directs the Commission, inter alia, to:

> Promulgate, implement, and revise a system of voluntary sentencing guidelines for use in the Superior Court of the District of Columbia designed to achieve the goals of certainty, consistency, and adequacy of punishment, with due regard for the: (A) Seriousness of the offense; (B) Dangerousness of the offender; (C) Need to protect the safety of the community; (D) Offender's potential for rehabilitation; and (E) Use of alternatives to prison, where appropriate[.]

D.C. Code § 3-101(b)(1). The "guidelines promulgated by the Commission shall not be binding on judges." *Id.* § 3-105(a). "Notwithstanding the guidelines, the judge in

an individual case may impose any sentence that does not exceed the maximum term prescribed by law and is not otherwise prohibited by the Constitution or laws of the United States or the District of Columbia." *Id.* § 3-105(b). And "[t]he sentencing guidelines shall not create any legally enforceable rights in any party nor shall they diminish any rights that currently exist." *Id.* § 3-105(c).

Mr. Davis does not assert that his sentence was illegal but instead argues that the trial court misunderstood the guidelines to be mandatory when imposing consecutive sentences for his three ADW convictions. This misunderstanding was an abuse of discretion, in his view, because the trial court did not exercise choice when the situation called for it. The government contends that the court comprehended the scope of its discretion and "made clear that it understood it could depart from the Guidelines." It cites the court's review of the guidelines' mitigating factors as evidence that it knew it could depart but chose not to. The government also argues that any comments by the court suggesting that it thought the guidelines were mandatory must be read in context.

Whether the trial court abused its discretion is a close question. On the one hand, as the government points out, the court, at times, appeared to understand that the guidelines were discretionary. For example, when reviewing the mitigating factors, the court declined to depart in part for discretionary reasons, including the

danger that Mr. Davis placed the victims of his assault in and his lengthy criminal history. It also noted that, in preparation for sentencing, it had reviewed Mr. Davis's PSR, the parties' sentencing memoranda, and letters of support from friends and family, suggesting that the guidelines would not solely dictate the sentence.

On the other hand, starting with the initial sentencing hearing, the court stated that Mr. Davis had to be sentenced to thirty-two and a half years and that that number "most certainly cannot go down" for the sentence to be "compliant with the law and the guidelines." Based on this determination, it questioned why Mr. Davis was asking to continue sentencing when, in its view, the outcome would be the same no matter what the PSR said. At the next hearing, the court asserted that, if it were to depart, it "would have to base" the departure "on mitigation factors that our Sentencing Commission has devised." Critically, the foundation for the length of Mr. Davis's sentence was the court's determination that "the guidelines *require this* [*c*]*ourt* to run the [AWIKWA] and the ADW [sentences] consecutive to each other." The court then reiterated that there was "no legal possibility that the court can go under" the thirty-two-and-a-half-year sentence. On balance, these statements, particularly the last one, cannot be easily explained away as "inartful," as the

government attempts to do, and they support Mr. Davis's view of the sentencing proceeding.[6]

Two additional aspects of the sentencing are concerning. First, the trial court disclosed that it had called the Sentencing Commission "to walk [it] through these numbers so that [it] would know what [Mr. Davis's] bottom number is so that when [it] heard allocutions from [Mr. Davis] . . . to keep [it] off of that number" it could inform the parties that "there's no legal possibility that the [c]ourt can go under that time."[7] This revelation reinforces the perception that the court's sentence adhered to

---

[6] We recently observed in *Caesar* that "consecutively-running sentences are the default" under D.C. Code § 23-112. 357 A.3d at 1164. The defendant in that case similarly argued that the trial court incorrectly thought it did not have discretion to sentence him concurrently. *Id.* We held, however, that nothing in the record supported the conclusion that the trial court erroneously felt itself bound by either the guidelines or the statutory scheme when sentencing the appellant to consecutive terms of imprisonment. *Id.* The same cannot be said for the trial court's statements in this case, where the court expressed a belief that the guidelines' mandate, and not its discretion, was the reason for imposing consecutive sentences, and it made no reference to Section 23-112 or any other statute.

[7] Although the issue is not squarely before us, the trial court's contact with the Sentencing Commission gives us significant pause. "[A] court is *not* permitted to use extra-judicial information . . . for sentencing purposes." *Carpenter v. United States*, 144 A.3d 1141, 1153 n.24 (D.C. 2016). Indeed, such conduct potentially implicates Rule 2.9(A) of the D.C. Code of Judicial Conduct, which states that, subject to limited exceptions not applicable here, "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending[ ] or impending matter[ ]."

the guidelines because the court incorrectly thought they were mandatory, and it thus reinforces our conclusion that the court abused its discretion by "[f]ail[ing] to exercise choice" when the situation called for it.[8] *(Darrell) Jones v. United States*, 336 A.3d 657, 663 (D.C. 2025) (quoting *(James) Johnson*, 398 A.2d at 363). Second, the trial court indicated at both the initial sentencing hearing and the continued hearing that it would not seriously entertain arguments that Mr. Davis's sentence

---

One purpose of that ban is to avoid "actual or apparent partiality" that could "undermine[ ] the confidence in the judiciary essential to the successful functioning of our democratic form of government." *Belton v. United States*, 581 A.2d 1205, 1214 (D.C. 1990) (citation modified). While judges "may consult with court staff and court officials whose functions are to aid the judge in carrying out the judge's adjudicative responsibilities, or with other judges," D.C. Code of Jud. Conduct R. 2.9(A)(3), we have not interpreted this "to refer to non-judicial branch personnel." *Foster v. United States*, 615 A.2d 213, 217 (D.C. 1992).

We need not analyze at length the trial court's conduct in this regard because neither party raises the issue, and we have determined that the court erred on other grounds. We note, however, that the court's communications with the Commission quite possibly violated Rule 2.9(A)'s prohibitions both on initiating and on considering ex parte communications "concerning a pending[ ] matter." *See Foster*, 615 A.2d at 216 (noting that a previous version of Rule 2.9(A) "prohibit[ed] both (1) initiating *ex parte* communications and (2) considering *ex parte* communications in rendering a decision"). The trial court disclosed that it called the Commission and that it considered the Commission's responses when sentencing Mr. Davis. The Commission is not comprised of "court staff or court officials," D.C. Code of Jud. Conduct R. 2.9(A); it is "an independent agency within the District of Columbia government," D.C. Code § 3-101.

[8] The court's communication with the Commission, when considering the proscription against ex parte communications, *supra* note 8, is also an "improper factor" that the court relied on in determining Mr. Davis's sentence. *See Austin*, 343 A.3d at 941.

could be less than thirty-two and a half years. The government counters that, because the court went through the guidelines' mitigating factors, it sufficiently entertained Mr. Davis's arguments. But the court's language suggests otherwise and stands in contrast to our decision in *Speaks*, where we partially relied on the fact that the trial court heard from the parties on how the guidelines should inform the sentence in concluding that the court did not abuse its discretion. 959 A.2d at 719. While it is true that the court allowed Mr. Davis's counsel to argue for a departure and a sentence of eleven and a half years, it made clear that it would not actually entertain this argument because there was "no legal possibility" that it could impose a lower sentence. Indeed, the court made this point at the initial sentencing hearing before Mr. Davis made any argument for a lower sentence, stating, "You guys are going to argue for whatever you're going to argue. So that number may go up, but it most certainly cannot go down." These statements by the court further reveal its failure to exercise choice in sentencing Mr. Davis and an apparent belief that the guidelines limited the court to a minimum length of imprisonment. *See Matter of L.J.*, 546 A.2d at 435 n.16 (holding that a "total failure" to exercise discretion results when a trial court incorrectly believes it is bound by the recommendation of nonstatutory legal material); *(Darrell) Jones*, 336 A.3d at 663, 666 (concluding that the trial court erred when it improperly confined itself to a nonexistent "hard-and-fast rule" regarding

the admission of evidence when it should have exercised its discretion when weighing admissibility).

On the whole, the trial court's statements and actions create at least a perception that the court thought it was bound to impose a sentence driven not by its own discretion but by the guidelines. *See (James) Johnson*, 398 A.2d at 363 ("Failure to exercise choice in a situation calling for choice is an abuse of discretion whether the cause is ignorance of the right to exercise choice or mere intransigence because it assumes the existence of a rule that admits of but one answer to the question presented.").

Having found an abuse of discretion, we must determine whether that error was harmless. *See Smallwood v. United States*, 312 A.3d 219, 227 (D.C. 2024) ("This court will affirm the trial court despite a non-constitutional error if the error was harmless . . . ."). "An error is harmless if we can say, with fair assurance, that the judgment was not substantially swayed by the error." *Faltz v. United States*, 318 A.3d 338, 348 (D.C. 2024) (citation modified).

Mr. Davis argues that the court's error was not harmless because he presented several justifications supporting a departure and it is likely that his sentence would have been lower if the court had understood that it was not bound by the guidelines. The government disagrees and contends, albeit through the lens of the plain-error

standard, that any error was harmless because the court made clear that it thought none of the mitigating factors applied and Mr. Davis's sentence was appropriate regardless of the guidelines. This demonstrates, according to the government, that there was no reasonable probability that the error materially impacted Mr. Davis's sentence.

Harmlessness also is a close question here, but the record does not "eliminate[ ]" our "doubt" that the trial court's error influenced its sentencing decision. *See Smallwood*, 312 A.3d at 227 (citation modified). To be sure, the trial court noted Mr. Davis's long and often violent criminal history and the four deaths that Mr. Davis could have caused. But when all was said and done, the court expressed its belief that it was required to sentence Mr. Davis to consecutive sentences for his AWIKWA and ADW convictions. While the court was correct that the guidelines urge courts to impose consecutive sentences when there are "[m]ultiple crimes of violence involving multiple victims in a single event[,]" D.C. Voluntary Sentencing Guidelines Manual § 6.1.a, the determination of whether offenses run consecutively or concurrently is "ultimately made by the Court[,]" D.C. Voluntary Sentencing Guidelines Manual Ch. 6. The court's belief that it was "require[d]" by the guidelines to run the sentences consecutively caused it to tack on an additional twenty-one years to Mr. Davis's sentence for his three ADW convictions. The court had a choice, and we cannot say "with fair assurance" that its

failure to exercise that choice did not "substantially sway" Mr. Davis's sentence. *Faltz*, 318 A.3d at 348; *see also Wright v. United States*, 508 A.2d 915, 919 (D.C. 1986) ("We cannot sustain a ruling that should have been discretionary, but was not, even though discretion, properly exercised, might have led to the same result.").

### 4. Remand

Finally, "[p]ursuant to our general supervisory authority, we also direct that the resentencing be conducted by a different judge." *Bradley v. District of Columbia*, 107 A.3d 586, 602 (D.C. 2015). "In deciding whether further proceedings should be conducted before a different judge, our primary concern must be to preserve the appearance of justice as well as its reality." *Lindsay v. United States*, 84 A.3d 50, 53 (D.C. 2014) (citation modified). To make this assessment, we have indicated that three factors should be considered: (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in discarding their previously expressed views or findings determined to be erroneous, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would be disproportionally wasteful and redundant compared to the benefit in preserving the appearance of fairness. *See In re D.E.*, 991 A.2d 1205, 1214 (D.C. 2010).

The trial court's reliance both on what it seemed to think were binding guidelines and on the Sentencing Commission's recommendation leaves "lingering concerns that might affect [Mr. Davis's] and the public's perception of the proceedings on remand." *Id.* These concerns create a "substantial difficulty" for the trial court on remand. *Id.* In particular, although we in no way suggest that the trial court would engage in such behavior, there could be an appearance that the court has an incentive to resentence Mr. Davis to the same term of imprisonment to demonstrate that the sentence it imposed the first time was the product of a discretionary decision and not a misunderstanding about the guidelines. *See Lindsay*, 84 A.3d at 53. Remand to a different judge does "not imply any personal criticism" of the trial court. *In re D.E.*, 991 A.2d at 1214 (quoting *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (en banc)). "Instead, it [ ] simply recognize[s] that there may be cases where both for the judge's sake and the appearance of justice, an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality." *Id.* at 1214-15 (citation modified).

Accordingly, "without casting any aspersion on the conscientiousness and integrity of the trial judge," *Graves v. United States*, 245 A.3d 963, 977 (D.C. 2021), we vacate Mr. Davis's sentences and remand to the trial court for resentencing before a different judge.

### III. Conclusion

For the foregoing reasons, we affirm Mr. Davis's convictions but vacate his sentences and remand the case to the Superior Court for resentencing.

*So ordered*.